**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IVICA LOZANCIC, | ) | CASE NO. 1:25-CV-1191 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION AND** |
| SECURITY, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

## I.      INTRODUCTION

The Commissioner of Social Security denied Plaintiff Ivica Lozancic's application for

Disability Insurance Benefits (DIB). Mr. Lozancic seeks judicial review of that decision pursuant

to 42 U.S.C. § 405(g). (Compl., ECF No. 1.) The parties have consented to a magistrate judge

exercising jurisdiction over the case pursuant to 28 U.S.C. § 636(c), Rule 73 of the Federal Rules

of Civil Procedure, and Local Rule 73.1. (Consent and Order, ECF No. 6.)

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision denying

Mr. Lozancic's application for benefits.

## II.      PROCEDURAL HISTORY

In September 2022, Mr. Lozancic applied to the Social Security Administration (SSA)

seeking DIB.[1] (Tr. 352.) He claimed that he became disabled on February 13, 2021. (*Id.*) He

identified eight[2] allegedly disabling conditions: (1) post-traumatic stress disorder; (2) nightmares

---

[1] The administrative transcript appears at ECF No. 7. The Court will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 213"). It will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 9") and page-identification numbers (e.g., "PageID# 1090").

[2] He identified cervical neuropathy twice. (Tr. 379.)

and inability to concentrate; (3) hand numbness; (4) cervical neuropathy; (5) disc herniations in the lumbar area; (6) depression; (7) anxiety; and (8) memory problems. (Tr. 379, 450.)

The SSA denied Mr. Lozancic's application initially and upon reconsideration. (Tr. 264, 270, 278, 280.) Mr. Lozancic requested a hearing before an administrative law judge ("ALJ"). (Tr. 296.) The ALJ held a hearing on March 27, 2024, at which Mr. Lozancic was represented by counsel. (Tr. 218–39.) Mr. Lozancic testified through a Croatian interpreter. (*Id.*) An independent vocational expert also testified at the hearing. (*Id.*)

On May 20, 2024, the ALJ issued a written decision finding that Mr. Lozancic is not disabled. (Tr. 192–213.)

Mr. Lozancic requested review of the ALJ's decision. (Tr. 349–51.) His counsel submitted a letter-brief explaining the alleged errors in the ALJ's decision. (Tr. 456–57.) Counsel argued, among other things, that the ALJ erred in the consideration of the medical source statement from treating professional Marie Thompson. (Tr. 456.) Counsel contended that Ms. Thompson's opinion "is supported by objective evidence and is consistent with the other evidence in the record." (*Id.*)

On April 9, 2025, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1.)

On June 6, 2025, Mr. Lozancic filed his Complaint, challenging the Commissioner's final decision that he is not disabled. (ECF No. 1.) Mr. Lozancic asserts the following assignment of error for review:

> The ALJ's RFC finding is not supported by substantial evidence because her evaluation of psychiatric nurse practitioner Marie Thompson, PMHNP-BC, FNP-BC's *Off-Task/Absenteeism Questionnaire* did not comply with the revised regulations for evaluating opinion evidence.

(Pl.'s Merit Br. at 12, ECF No. 9, PageID# 1090.)

III.    **BACKGROUND**

    A.    <u>**Previous Application for Social Security Benefits**</u>

Mr. Lozancic previously applied for DIB and Supplemental Security Income (SSI) benefits on June 11, 2019, alleging disability beginning in January 2018. (Tr. 243.) An ALJ issued a written decision denying the application on February 12, 2021. (Tr. 240.) In that decision, the ALJ found that Mr. Lozancic had severe impairments of: (1) osteoarthritis of the left knee and lumbar spine; and (2) PTSD. (Tr. 246.)

Nevertheless, the ALJ concluded that Mr. Lozancic had the residual functional capacity to perform light work with certain exertional and non-exertional limitations. (Tr. 248.) Specifically, with respect to non-exertional limitations, Mr. Lozancic could understand, remember, and carry out simple instructions in a routine work setting with few changes. (*Id.*) He could respond appropriately to supervisors, coworkers, and "work situations" if the work required no more than superficial interaction. (*Id.*) The ALJ explained that, by "superficial," the ALJ meant that Mr. Lozancic cannot perform work that requires negotiating with, instructing, persuading, or directing the work of others. (*Id.*)

Based on those and other findings, the ALJ determined that Mr. Lozancic was not disabled. (Tr. 257.)

    B.    <u>**Personal, Educational, and Vocational Experience**</u>

Mr. Lozancic was born in January 1968 in what is now Croatia or Bosnia and Herzegovina. (Tr. 359–60.) He completed high school in the country of his birth. (Tr. 362, 380.) He served in the military from 1992 to 1998, fighting in "the Croatian war."[3] (Tr. 385.) He became a prisoner of

---

[3] The Court understands this to refer to the Croatian War of Independence. (*See* Tr. 403.)

war during the conflict. (*Id.*) Mr. Lozancic came to the United States with his family in 2001. (Tr. 404.)

He was 54 years old on the date of his current application. (*E.g.*, Tr. 352.) He is married and has children. (Tr. 360, 362.) He speaks very little English. (Tr. 362.) He has not worked since 2016. (Tr. 361.) Prior to stopping work, Mr. Lozancic worked as an operator of computer numerical control machines and then in "tractor parts assembly." (Tr. 380–81, 386, 449.)

### C.      Function Reports

Mr. Lozancic's counsel informed the agency that Mr. Lozancic's back pain leaves him unable to sit, stand, or walk for any length of time. (Tr. 385.) He has developed numbness in his hands, causing him to drop things and to be unable to clench things. (*Id.*) He is "limited in his ability to perform activities of daily living." (*Id.*) His lack of sleep, depression, anxiety, and PTSD have diminished his concentration and memory. (*Id.*) He sleeps only four hours per night, has nightmares, and no longer socializes with friends. (*Id.*)

The record contains a function report, which Mr. Lozancic says his daughter completed for him; it is dated December 14, 2022. (Tr. 395–402; *see also* ECF No. 9, PageID# 1083.) He stated that he had nightmares and "a lot of times" does not get enough sleep. (Tr. 395.) His "memories haunt [him]"; he has flashbacks of torture and other bad memories from his time as a prisoner of war. (*Id.*) When these happen, his "whole day changes" and he becomes so angry that he does not want to see or talk to others. (*Id.*) He loses his appetite. (*Id.*) If people try to talk to him, he either ignores them or "flip[s] out and start[s] a fight." (*Id.*)

On an average day, Mr. Lozancic will wake up and drink coffee or tea. (Tr. 396.) He then spends most of his day lying down. (*Id.*) He tries to use a transcutaneous electrical nerve stimulation (TENS) unit at least three times a day to help with his physical pain. (*Id.*) Some days he is able to use an exercise bicycle. (*Id.*) He takes multiple naps throughout the day and watches

4

television at times. (*Id.*) He spends most of the time alone in his room. (*Id.*) His wife prepares meals for him throughout the day. (*Id.*)

Mr. Lozancic goes long periods of time without shaving and needs reminders to shower and brush his hair. (Tr. 396–97.) He often has a poor appetite. (*Id.*) Sometimes he needs a reminder to take his medication. (Tr. 397.) He said that his "depression overpowers [his] emotions throughout the day," such that he "can't get [himself] to want to take care of [himself.]" (*Id.*)

Mr. Lozancic does not do indoor chores. (*Id.*) He will mow the grass around once per month; it takes him around 45 minutes total, but he takes breaks. (*Id.*) It takes encouragement for him to do this chore, as usually he is too sad to build the motivation to do it. (*Id.*)

Mr. Lozancic is able to drive, and he can go out alone for "simple tasks" like getting gas. (Tr. 398.) For more involved tasks, like doctors' appointments, he prefers to have someone go with him because he gets "very irritable." (*Id.*) He does not do much shopping, and what little he does he does online to avoid having to interact with others. (*Id.*) He finds himself being "scared to be alone in unfamiliar situations." (Tr. 399.)

Mr. Lozancic spends many hours a day watching television. (*Id.*) Most of his time is spent lying in bed. (*Id.*) He will sometimes watch television with his wife, or talk to his children, but not often. (*Id.*) He finds himself in frequent conflict with his family. (*Id.*) He used to be able to have conversations with others, but now he fights with people. (Tr. 400.) He gets irritated and does not want to talk to anyone. (*Id.*) It is hard for him to focus, concentrate, or "know what's going on." (*Id.*) He has a hard time following instructions; he only wants to do things "[his] way" and then only "when [he feels] okay." (*Id.*) He can pay attention for only 30 minutes. (*Id.*) He sometimes gets along with authority figures "okay," but other times "not well." (*Id.*) He gets frustrated very easily. (*Id.*)

5

Mr. Lozancic does not handle stress well; he "shut[s] down" and does not talk to anyone. (Tr. 401.) Changes to his routine upset him. (*Id.*) He finds himself having fears that he will be harmed. (*Id.*)

Mr. Lozancic's daughter wrote a letter to the agency about her father. (Tr. 403–04.) The letter is not dated. His daughter described in detail the mistreatment, torture, and other circumstances of his time as a prisoner of war. (Tr. 403.) She wrote that he is "affected on a daily basis by these events." (*Id.*) She described that he has trouble sleeping, experiences night terrors, and sweats and screams in his sleep. (*Id.*) She said that Mr. Lozancic "struggles to have good relationships with everyone in his life." (*Id.*) She said that he has "shut down," isolating himself from even his family. (*Id.*) She stated that his condition is getting worse over time. (*Id.*)

Mr. Lozancic's daughter wrote that Mr. Lozancic has difficulty in public; he has a hard time making eye contact and has had panic attacks in large crowds. (Tr. 403–04.) He can be triggered by loud or surprising noises. (Tr. 403.)

Mr. Lozancic's daughter described that Mr. Lozancic has struggled with PTSD for her entire life. (Tr. 404.) She and her sibling were not allowed to wear green growing up (the color of the uniforms of his captors), and they would hear Mr. Lozancic express suicidal ideation. (*Id.*) Mr. Lozancic's daughter confirmed that Mr. Lozancic spends most of his time in his bedroom, with the door closed. (*Id.*) He struggles "to even put his words together." (*Id.*)

In appealing the agency's internal disability findings, Mr. Lozancic's counsel reported that his mental condition seemed to change daily; he is "declining," losing hope, struggling with night terrors, and "avoiding sleeping so he does not go in[to] his night terrors." (Tr. 406; *see also* Tr. 408, 418, 421 (again describing deterioration).)

### D.        Relevant Hearing Testimony

#### 1.        *Mr. Lozancic's Testimony*

Mr. Lozancic testified that he has been suffering from back pain for ten years "and every year it gets worse." (Tr. 230.) He said that he has suffered from PTSD since 1997. (*Id.*) He has been treating with doctors for eight years. (*Id.*) Sometimes his symptoms are "better" and sometimes they are "not good at all." (*Id.*) He cannot sleep at night; when he does sleep, his family reports that he "talk[s] all the time." (Tr. 233.) He has "flashbacks" every morning, especially when he washes his face. (*Id.*)

Mr. Lozancic does not socialize with anyone and spends most of his time in his room. (*Id.*) He had trouble getting along with coworkers when he used to work. (*Id.*) Crowds bother him, and he has difficulty with anger and irritability. (*Id.*) His focus and concentration are "not good." (*Id.*)

#### 2.        *Vocational Expert's Testimony*

Laura Pizzurro testified as a vocational expert ("VE") at the hearing. (Tr. 234.) The ALJ asked the VE to assume that a hypothetical individual is capable of light work with certain additional exertional and non-exertional limitations. (Tr. 234–35.) Specifically, the individual can lift and carry up to 10 pounds frequently and up to 20 pounds occasionally. (Tr. 234.) They can frequently climb ramps and stairs but could never climb ladders, ropes, or scaffolds. (*Id.*) They can frequently balance, stoop, kneel, crouch, and crawl. (*Id.*) They should avoid work at unprotected heights, and they cannot operate power saws or jackhammers. (*Id.*)

With respect to non-exertional limitations, the hypothetical person can understand, remember, and apply information to complete "simple and detailed instructions." (*Id.*) They can maintain concentration, persistence, and pace for two hour blocks of time, with normal breaks. (*Id.*) They can adapt to "routine type changes" in work tasks. (*Id.*) They can interact with the

7

general public, coworkers, and supervisors for work that does not require negotiating with, instructing, persuading, or directing the work of others. (*Id.*)

The VE testified that such a person could perform work that exists in the national economy, such as the work of a cleaner (DOT 323.687-014), marker (DOT 209.587-034), or inspector and hand packager (DOT 559.687-074). (Tr. 235.)

The ALJ asked the VE if her opinion would change if the person was limited to only "incidental" contact with the general public. (*Id.*) The ALJ explained that, by "incidental," she meant things like polite greetings. (*Id.*) The VE testified that a person with that additional limitation the individual would still be able to perform the jobs identified. (Tr. 236.)

Mr. Lozancic's counsel then asked the VE to imagine that the hypothetical person was further limited to no interaction with the public or coworkers, and to only occasional interaction with supervisors. (*Id.*) The VE said that such a combination of limitations would be work-preclusive. (*Id.*)

Counsel asked the VE to take the individual from the ALJ's first hypothetical and to further limit them to sedentary work. (Tr. 237.) The VE confirmed that a person so limited could not perform Mr. Lozancic's past relevant work as an operator of CNC machines. (*Id.*) The VE opined that there are no transferable skills from the CNC operator position to sedentary work, nor to light work with the additional limitations in the first hypothetical. (*Id.*)

The VE testified that there would be no competitive employment available to someone who would be off task for 20 percent of the workday; employers will tolerate up to 10 percent. (*Id.*) Employers will tolerate no more than one absence per month. (Tr. 238.)

### E.  State Agency Consultants

A disability examiner (Ronni Pruitt), a physician (Mehr Siddiqui, M.D.) and a psychologist (Martin Koretzky, Ph.D.) reviewed Mr. Lozancic's claim at the initial review level. (Tr. 264–71.)

Dr. Siddiqui concluded that there was insufficient evidence in the record (as of February 2023) to evaluate the alleged cervical neuropathy, lumbar disc herniations, and hand numbness during the relevant period. (Tr. 268.)

Dr. Koretzky similarly opined that the records documented diagnoses of PTSD and major depressive disorder but were insufficient to determine the severity of those impairments. (*Id.*) Dr. Koretzky wrote that information about Mr. Lozancic's activities of daily living prior to his date last insured would be needed, in addition to a more detailed mental status examination from before the date last insured. (*Id.*)

Based on these conclusions, the agency consultants found that Mr. Lozancic was not disabled. (Tr. 270.)

In a letter explaining this decision to Mr. Lozancic, the SSA wrote that "[t]he evidence . . . is not sufficient to fully evaluate your claim and the evidence needed cannot be obtained." (Tr. 290.)

A disability examiner (Julie Greenwood), a physician (John Bradley, M.D.), and a psychologist (Deryck Richardson, Ph.D.) reviewed Mr. Lozancic's claim at the reconsideration level. (Tr. 274–80.)

Dr. Bradley found the initial medical findings to be unsupported by the medical evidence. (Tr. 277.) He opined on a number of exertional limitations, noting that multilevel degenerative disc disease of the lumbar spine, osteoarthritis of the left knee, and obesity precluded greater exertion. (Tr. 276–77.)

But Dr. Richardson found that the initial determination of insufficient evidence regarding Mr. Lozancic's mental functioning was consistent with, and supported by, the initial level documentation. (Tr. 274.) He signed his opinion in September 2023. (Tr. 276.)

9

Based on these opinions, the consultants affirmed that Mr. Lozancic was not disabled. (Tr. 278.)

In a letter explaining this decision to Mr. Lozancic, the agency again wrote that there was "insufficient evidence to evaluate the severity of your mental health conditions." (Tr. 295.)

### F.    Relevant Medical Evidence[4]

Mr. Lozancic consulted with Nicole Berry, a psychiatric nurse practitioner, on March 9, 2020. (Tr. 791.) Mr. Lozancic's wife was present for the appointment and helped facilitate communication. (*See id.*) Through his wife, Mr. Lozancic reported continued anxiety, nightmares, depression, and mood swings but said that his symptoms had improved (*Id.*). He described having waking flashbacks from his time in war. (*Id.*) On examination, he was well groomed and displayed average eye contact, a cooperative demeanor, clear speech, a euthymic mood with full affect, and a logical thought process. (Tr. 791–92.) His memory, attention, and concentration were all normal. (Tr. 792.) Ms. Berry rated Mr. Lozancic's global improvement as "very much improved," and she continued him on his current medication. (Tr. 795.)

Mr. Lozancic consulted with Marie Thompson, another psychiatric nurse practitioner, in a telehealth appointment on April 6, 2020. (Tr. 786.) His wife continued translating at this and at

---

[4] During the administrative proceedings, Mr. Lozancic alleged that he was disabled as a result of both physical and mental conditions. In this proceeding, he challenges the ALJ's analysis only with respect to his mental conditions. The Court therefore focuses its summary on the evidence relevant to his mental conditions and limitations. There are a number of medical records in the transcript from doctors' visits focused on Mr. Lozancic's physical conditions. The Court has reviewed them, but they are not summarized in detail here both because the visits focused on Mr. Lozancic's physical conditions and because neither party relies on them in this proceeding. (Tr. 30, 84, 134, 150, 171, 188, 465, 470, 475, 480, 485, 489–91, 493, 797, 802 ("no suicidal ideation"), 808 (mood and behavior normal), 813 ("no suicidal ideation"), 819 ("no suicidal ideation"), 824, 844, 847 ("no confusion, no memory lapses or loss, no depression and no sleep disturbances"), 850 (mood and affect normal), 852, 855, 879, 883, 887 (primary care doctor agrees with PTSD diagnosis), 891, 897 (normal mood and affect), 912–27, 950, 959, 969 (noting anxiety and stress at primary care appointment), 982, 991 (normal mood and affect), 1007, 1027 (he is "depressed" and "stressed out" but "not suicidal"), 1050.)

future appointments. Mr. Lozancic said he was "doing better," although he continued to have nightmares a "couple times a week" and "some anxiety at times due to flashbacks" from war. (*Id.*) He was sleeping five to six hours per night, and he denied suicidal or homicidal ideation. (*Id.*) He said he was satisfied with his medication regimen and denied any adverse side effects from his medications. (*Id.*) He denied depression, mood swings, and irritability. (*Id.*) He endorsed episodic memory loss. (Tr. 787.)

On examination, Mr. Lozancic's mood was euthymic. (Tr. 788.) His attention, concentration, reasoning, and thought processes were normal. (*Id.*) His memory was "impaired." (*Id.*)

Mr. Lozancic continued seeing Ms. Thompson around once a month through December 2020, with minor changes in symptomology and mental status examination findings noted. (Tr. 780–81 ("nightmares have improved," but complaint of depression and irritability "at times" and panic attacks), 774–75 (moderate depressive feelings but no irritability), 768–69 (isolating at times, with mood swings and sadness, but having decreased nightmares; euthymic mood on examination), 759, 764, 753–54 ("some days are not too bad," but having "ups and downs at times," with irritability "due to pain"), 747, 615 ("decreased nightmares overall" but ongoing depression unchanged from previous appointment), 609–10 (anxiety at times, but no panic attacks), 602–03 (not sleeping well due to nightmares three nights a week; depressive symptoms "up and down," tied to his ongoing disability application), 596 (making medication changes due to depression and increased nightmares).

On January 12, 2021, Mr. Lozancic again consulted with Ms. Thompson. (Tr. 589.) He reported that he had been taking his medication as prescribed, resulting in decreased depression (*Id.*) He said he was "doing a little better" and denied any side effects. (*Id.*) He denied mood swings

11

and irritability. (Tr. 590.) His sleep was mildly improved. (*Id.*) On examination, he presented with a depressed mood and impaired memory, but he exhibited logical thought processes and normal attention, concentration, reasoning ability, judgment, and impulse control. (Tr. 591.)

At his follow-up appointment on February 9, 2021, Mr. Lozancic again reported that he was "doing better," with decreased depression and nightmares since the previous appointment. (Tr. 582.) On examination, he again had impaired memory but was cooperative with a euthymic mood and normal attention, concentration, thought processes, and reasoning. (Tr. 584.)

For purposes of the application at bar, Mr. Lozancic claimed to become disabled on February 13, 2021. (Tr. 352.)

On March 9, 2021, at the appointment immediately following the denial of his previous disability application, Mr. Lozancic reported increased stress as a result of the denial. (Tr. 575.) At the time of this appointment, Mr. Lozancic was taking prazosin, sertraline, mirtazapine, and brexpiprazole. (Tr. 578.) Mr. Lozancic declined to increase the dosage of brexpiprazole, which had been discussed due to the continued depression symptoms. (Tr. 575.)

Mr. Lozancic's depression was "up and down" (though mildly improved), with continued insomnia, as reported as his next appointment on April 6, 2021. (Tr. 568–69.) He was having nightmares twice a week. (Tr. 569.) On examination, Mr. Lozancic presented with a depressed mood, circumstantial thought process, and impaired memory. (Tr. 570.) His attention and concentration were normal, and his intelligence and reasoning were average and intact. (*Id.*) Ms. Thompson stated Mr. Lozancic took melatonin and noted that he declined to increase his brexpiprazole dosage. (Tr. 568.)

By May 4, 2021, Mr. Lozancic was sleeping a little better with the melatonin. (Tr. 561.) His depressive symptoms were again mildly improved. (Tr. 562.) On examination, Mr. Lozancic

presented with depressed mood and impaired memory, but he was cooperative and displayed normal attention, concentration, and thought processes. (Tr. 563.) Ms. Thompson increased the dosage of the melatonin. (Tr. 561.)

At his appointment on June 3, 2021, Mr. Lozancic again reported mild improvement in his depression and better sleep. (Tr. 555.) His anxiety in social situations was reported as mild, "moderate at times." (Tr. 556.) The mental examination was largely unchanged from previous appointments. (Tr. 557.)

On June 14, 2021, Ms. Thompson completed an "Off-Task/Absenteeism Questionnaire." (Tr. 976.) The form asked whether she believed that Mr. Lozancic would be off task for at least 20 percent of the workday; Ms. Thompson checked "Yes." (*Id.*) When asked to identify the underlying mental impairments that had been established by objective and clinical findings, Ms. Thompson wrote, "Anxiety, Depression, Psychosocial impairments, Flashbacks, crying spells, hypervigilance." (*Id.*) She wrote that Mr. Lozancic had insomnia and an impaired memory "secondary to diagnosed psychiatric disorders" and indicated that he had an inability to concentrate, pay attention, and focus. (*Id.*) She identified the side effects of his medication as drowsiness and fatigue. (*Id.*) She wrote that he has "8/10" pain in his back, leg, and knee. (*Id.*) When asked to opine on how frequently Mr. Lozancic would be absent from work, Ms. Thompson checked the box stating that he would be absent around four times per month. (*Id.*) Ms. Thompson checked "Yes" when asked whether the severity of Mr. Lozancic's symptoms had existed since March 19, 2016. (*Id.*)

In a medical source statement completed the same day, Ms. Thompson wrote that she began treating Mr. Lozancic on July 26, 2018. (Tr. 977.) She identified Mr. Lozancic's diagnoses as PTSD and major depressive disorder. (*Id.*) She checked boxes opining on a moderate limitation (defined

as a "fair limitation") in Mr. Lozancic's ability to understand, remember, or apply information and to adapt or manage himself. (*Id.*) She indicated a marked limitation ("seriously limited") in his ability to interact with others and to concentrate, persist, or maintain pace. (*Id.*) She again wrote that these limitations had existed since March 19, 2016. (*Id.*)

Mr. Lozancic met with Ms. Thompson in a telephone appointment on July 1, 2021. (Tr. 548.) His depression was reported to be mildly worse in the past month, with stressors including his physical pain and financial stress. (*Id.*) He complained of continued episodes of excessive crying "at times." (Tr. 549–50.) His mental status examination findings were largely unchanged. (Tr. 550.) Ms. Thompson increased the dosage of melatonin and brexpiprazole. (Tr. 548.)

When Mr. Lozancic had his next telephone appointment on July 29, 2021, he had decreased depression, improved mood, and better sleep. (Tr. 541.) His anxiety in social situations was decreased. (Tr. 542.) His mental status examination was largely unchanged. (Tr. 543.) Ms. Thompson continued him on the medication regimen. (Tr. 541.)

Mr. Lozancic had a follow up telehealth appointment on September 27, 2021. (Tr. 535.) His depression was decreased further; he was "sleeping better," and his mood had been stable. (*Id.*) His flashbacks were "improving" as well. (Tr. 536.) Ms. Thompson rated his global improvement as "much improved." (Tr. 539.) No medication changes were made. (Tr. 535.)

Mr. Lozancic reported continued improvement in his depression on November 22, 2021. (Tr. 529.) His mood remained stable. (*Id.*) He was continued on the same medication regimen. (*Id.*)

Mr. Lozancic's date last insured was December 31, 2021. (Tr. 199.)

Mr. Lozancic's condition was "stable" on his medication, as reported at a telehealth appointment on January 17, 2022. (Tr. 523.) He had decreased nightmares since his last visit;

indeed, he had "very few." (Tr. 523–24.) Ms. Thompson again rated his improvement as "much improved." (Tr. 527.)

At his appointment on March 31, 2022, Mr. Lozancic said he was "doing 'okay'" on his current medications. (Tr. 518.)

At an appointment on June 2, 2022, Mr. Lozancic reported doing "so-so" but did not report a change in symptoms since his last appointment. (Tr. 508.) He said he had moderate depressive symptoms "sometimes," mood swings and irritability "[due to] pain," insomnia and nightmares "some nights," flashbacks "sometimes," excessive crying "sometimes," and episodic memory loss. (Tr. 508–10.) He complained of anxiety but denied panic attacks. (Tr. 509.) On examination, Mr. Lozancic presented with depressed mood, a circumstantial thought process, and impaired memory. (Tr. 514) He had full affect and displayed normal eye contact, a cooperative demeanor, and normal attention and concentration. (*Id.*)

On August 25, 2022, Mr. Lozancic said his mood was sometimes "up and down" but reported no new symptom changes. (Tr. 502.) His depressive symptoms were generally improved, though. (*Id.*) He was sleeping five to seven hours per night. (Tr. 503.)

On October 24, 2022, Mr. Lozancic said he was "doing 'okay'" and reported no significant changes in symptoms. (Tr. 496–97.)

On November 2, 2023, he noted that "some days are better than others" when it comes to his mood. (Tr. 928.) His mental status examination remained largely unchanged; he had impaired memory but a cooperative demeanor and normal attention, concentration, and thought processes. (Tr. 929.)

On December 7, 2023, Mr. Lozancic said he was sleeping "fair," considering his physical pain. (Tr. 934.) His symptoms were largely the same as in past appointments. (Tr. 934–35.) His nightmares were decreased. (Tr. 935.)

His nightmares continued decreasing between that appointment and his next on January 4, 2024. (Tr. 940.) Ms. Thompson decreased the dosage of Mr. Lozancic's mirtazapine. (*Id.*)

He continued to report improved sleep (five to six hours a night with decreased nightmares) on February 29, 2024. (Tr. 1033.) He was having occasional flashbacks. (*Id.*) On examination, his mood was euthymic. (Tr. 1035.)

The record contains a letter from Ms. Thompson, dated March 21, 2024, in which she states that she reviewed her June 2021 medical source statements and "reaffirm[s] that all [her] responses . . . still hold true and that no significant improvement has occurred" in Mr. Lozancic's condition. (Tr. 1023.)

The record also contains a letter from Ms. Thompson, dated July 25, 2024, in which she confirms that Mr. Lozancic has been diagnosed with PTSD and moderate recurrent major depressive disorder. (Tr. 17.)

## IV.     THE ALJ'S DECISION

The ALJ found that Mr. Lozancic last met the insured status requirements of the Social Security Act on December 31, 2021. (Tr. 199.) The ALJ further found that Mr. Lozancic had not engaged in substantial gainful activity between the alleged onset date and the last-insured date. (*Id.*)

The ALJ next determined that Mr. Lozancic had the following severe impairments: (1) osteoarthritis of the left knee; (2) degenerative disc disease of the lumbar spine; (3) obesity; (4) post-traumatic stress disorder; and (5) major depressive disorder. (*Id.*)

The ALJ found that Mr. Lozancic had non-severe impairments of: (1) gastroesophageal

16

reflux disease; (2) hypertension; (3) hypothyroidism; and (4) vitamin B deficiency. (*Id.*)

The ALJ then concluded that none of Mr. Lozancic's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 200.)

The ALJ determined that Mr. Lozancic had the residual functional capacity ("RFC") to perform a full range of work at the light exertional level with a number of additional limitations. (Tr. 203–04.)

With respect to exertional and environmental limitations, Mr. Lozancic can frequently climb ramps and stairs but can never climb ladders, ropes, or scaffolds. (Tr. 203.) He can frequently balance, stoop, kneel, crouch, and crawl. (*Id.*) He must avoid unprotected heights and cannot operate power saws or jackhammers. (*Id.*)

With respect to non-exertional limitations, Mr. Lozancic can understand, remember, and apply information to complete "simple and detailed" instructions. (*Id.*) He can maintain concentration, persistence, and pace for two hour blocks of time with normal breaks. (*Id.*) He can adapt to "routine type changes" in work tasks. (*Id.*) He can interact with the general public, co-workers, and supervisors for work that does not require negotiating with, instructing, persuading, or directing the work of others. (Tr. 203–04.)

The ALJ concluded that Mr. Lozancic was unable to perform his past relevant work as a CNC machine operator. (Tr. 211.) The ALJ found that Mr. Lozancic was 53 years old on the date last insured and had a high school education. (*Id.*)

The ALJ then determined that—considering Mr. Lozancic's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that he could perform, including work as a "cleaner" (DOT 323.687-014), "marker" (the ALJ

17

identified "DOT 209.587-0134")[5], or "inspector – hand packer" (DOT 559.687-074).[6] (Tr. 212.)

Accordingly, the ALJ concluded that Mr. Lozancic was not disabled. (Tr. 213.)

## V.     LAW & ANALYSIS

### A.     Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir.

---

[5] There is no entry associated with "DOT 209.587-0134." It seems that the ALJ made a typographical error in attempting to refer to "marker (retail trade; wholesale tr.)" (DOT 209.587-034).

[6] These jobs refer to entries in the U.S. Department of Labor's *Dictionary of Occupational Titles*. The DOL no longer publishes the tool—*see Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014)—but the most recent version, from 1991, is available online through the DOL's Office of Administrative Law Judges Law Library. *Dictionary of Occupational Titles—Fourth Edition, Revised 1991*, U.S. DEPT. OF LABOR OFF. OF ADMIN. L. JUDGES, https://www.dol.gov/agencies/oalj/topics/libraries/LIBDOT.

2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B.       Standard for Disability

To establish entitlement to DIB, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 404.1520. First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of

19

impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent him

20

from doing his past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 404.1520(g). *See Abbott*, 905 F.2d at 923.

### C.     <u>Analysis</u>

Mr. Lozancic argues that the ALJ's analysis with respect to Ms. Thompson's June 2021 medical source statements did not comply with 20 C.F.R. § 404.1520c, in that the ALJ "did not accurately characterize the basis for Ms. Thompson's opinion as to off-task behavior and absenteeism." He says that the ALJ improperly suggested that the regulations required a treating source to directly cite their own treatment records to be deemed persuasive. He further contends that the ALJ erred in finding Ms. Thompson's opinions to be "conclusionary." He insists that Ms. Thompson's bases for her opinions find support in the record, including in medical records reflecting depressed mood, circumstantial thought processes, impaired memory, and ongoing impaired sleep issues stemming from his recurrent nightmares.

Social Security Ruling ("SSR") 98-6p provides that "[i]f the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." 1996 WL 374184, at *7 (July 2, 1996).

Agency regulations state that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a).

Instead, the SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to

articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1). Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. Id.

The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. *See* 20 C.F.R. § 404.1520c(c)(1). "In other words, the supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (*quoting Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)). The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. *See* 20 C.F.R. § 404.1520c(c)(2).

"As long as the ALJ discussed the supportability and consistency of the opinion and supported [the ALJ's] conclusions with substantial evidence within his decision, the Court will not disturb [the ALJ's] decision." *Njegovan v. Comm'r of Soc. Sec.*, No. 5:21-CV-00002-CEH, 2022 WL 1521910, at *4 (N.D. Ohio May 13, 2022).

Here, the ALJ found Ms. Thompson's June 2021 medical source statements to be "partially persuasive." (Tr. 210.) The ALJ identified multiple bases for that conclusion.

First, the ALJ acknowledged that Ms. Thompson personally examined Mr. Lozancic before Ms. Thompson concluded that he was moderately limited in his ability to understand, remember, or apply information, and to adapt or manage himself, and markedly limited in his ability to interact with others and to concentrate, persist, or maintain pace. (*Id.*)

22

The ALJ then found that the opined moderate limitations were persuasive. (*Id.*) The ALJ noted that these conclusions were "supported by and consistent with the more complete medical record." (*Id.*)

The ALJ then found that the opined marked limitations—as well as the opinion that Mr. Lozancic would be off task for at least twenty percent of the workday and absent four times per month—were not persuasive. (*Id.*) The ALJ wrote that these conclusions were "not supported by, or consistent with, the more complete medical record." (*Id.*)

In explaining this finding, she first noted that Ms. Thompson's medical opinion was in the form of a checklist "with specific embedded options for time off task." (*Id.*) She acknowledged that Ms. Thompson listed five bases for her opinions. (*Id.*)

The ALJ noted that the first basis was a list of "conclusionary" reasons "such as anxiety, depression and psychosocial impairments." (*Id.*) The ALJ wrote, however, that Ms. Thompson "did not provide any specific details or examples from treatment notes to help quantify or further support her opinion." (*Id.*) The ALJ noted that Ms. Thompson also did not provide narrative explanation or support for her opinion on likely absenteeism. (*Id.*)

The ALJ next discussed that Ms. Thompson had opined that Mr. Lozancic's psychiatric disorders were "serious and persistent" in the form of a checkmark, without further explanation. (Tr. 210, citing Tr. 977.) The ALJ also noted that Ms. Thompson checked a box confirming that Mr. Lozancic's serious limitations had existed since March 2016, despite the fact that she did not begin treating him until 2018, and there was no record that she had reviewed any treatment records pre-dating their treatment relationship. (Tr. 210; *see also* Tr. 977 (identifying that Ms. Thompson began treating Mr. Lozancic in July 2018).)

The ALJ then discussed her review of Ms. Thompson's treatment notes, identifying—with citations to those records—how Ms. Thompson's examination findings "are not consistent with finding that the claimant has any marked limitations in any area of mental functioning, nor that the claimant would be off-task or absent from work." (Tr. 210.)

Specifically, the ALJ acknowledged that Ms. Thompson's treatment records reflected that Mr. Lozancic at times presented to appointments with a depressed mood and impaired memory. (Tr. 210, citing, e.g., Tr. 640, 676.) But the ALJ found that Ms. Thompson's record as a whole "contains generally unremarkable mental status examination findings." (Tr. 210.) The ALJ cited mental status examinations in which Ms. Thompson found Mr. Lozancic to be oriented, to have a euthymic mood and full affect, to have an intact ability to abstract, and to have normal memory. (*Id.*, citing, e.g., Tr. 749, 1035.) The ALJ noted that Mr. Lozancic was cooperative throughout Ms. Thompson's treating notes. (*Id.*, citing, e.g., 640, 676, 717.)

The Commissioner defends the ALJ's conclusions and reasoning, pointing out that the ALJ cited Ms. Thompson's own treating notes in finding that her opinion was not fully persuasive. The Commissioner argues that this adequately addresses supportability. The Commissioner contends that the ALJ's conclusions were supported by substantial evidence.

After careful consideration, the Court agrees with the Commissioner.

First, the ALJ's decision to afford Ms. Thompson's opinion less than full weight because of its cursory, checkbox format was reasonable. *See Burr v. Bisignano*, No. 1:25-cv-01072-RJS, 2026 WL 32081, at *8 (N.D. Ohio Jan. 6, 2026) (ALJ did not err is diminishing persuasiveness of "checkbox format" medical opinion, where the doctor merely noted a diagnosis and stated that he had a "limited ability to leave the house" without further explanation) (citing *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 475 (6th Cir. 2016)). The forms that Ms. Thompson filled out

provided a brief amount of space, which only allowed her to list Mr. Lozancic's diagnoses and primary symptoms, including that his "memory [was] impaired" and that he had insomnia, both "secondary to" his diagnoses. (*See* Tr. 976.) She checked boxes indicating her opinion of moderate and marked limitations in various functional areas with no narrative explanation at all. (*See* Tr. 977.) Because of the lack of a detailed explanation, Ms. Thompson's opinions were largely "vague and unhelpful." *See Dollinger v. Comm'r of Soc. Sec.*, 2023 WL 1777386, at *4 (6th Cir. Feb. 6, 2023) (checkbox form with an additional statement that the claimant had undergone surgery and suffered an infection was "patently deficient").

Second, it was reasonable for the ALJ to note that Ms. Thompson's opinion was less persuasive because it was internally inconsistent; she identified that she began treating him in 2018 but opined that the limitations she found had remained consistent going back to 2016. *See Brown v. Comm'r of Soc. Sec.*, No. 1:23-CV1096, 2024 WL 1531453, at *17–18 (N.D. Ohio Mar. 1, 2024) (discussing a medical source opinion's internal inconsistency in affirming an ALJ's supportability reasoning), *report and recommendation adopted*, 2024 WL 1555772 (N.D. Ohio Apr. 10, 2024).

Third, and most importantly, the ALJ thoroughly discussed Ms. Thompson's own treatment notes and explained—with citations to those notes—that the notes are inconsistent with Ms. Thompson's medical opinions as stated in the June 2021 source statements. An ALJ properly addresses supportability by noting that a physician's opinion is inconsistent with the physician's own treatment records. *See Rattliff v. Comm'r of Soc. Sec.*, No. 1:20-cv-01732, 2021 WL 7251036, at *9 (N.D. Ohio Oct. 29, 2021) (holding that ALJ addressed supportability factor by noting that physician's opinion was inconsistent with physician's treating notes), *report and recommendation adopted*, 2022 WL 627055 (N.D. Ohio Mar. 3, 2022); *Neff v. Comm'r of Soc. Sec.*, No. 5:18 CV 2492, 2020 WL 999781, at *11 (N.D. Ohio Mar. 2, 2020); *see also Hopkins v. Comm'r of Soc.*

25

*Sec.*, No. 23-5696, 2024 WL 3688302, at *3 (6th Cir. Apr. 9, 2024) (approving an ALJ's supportability explanation where, among other things, the ALJ found the opinion unsupported by the objective findings in her medical report).

In his reply brief, Mr. Lozancic argues that the ALJ failed to acknowledge his "hypervigilance and insomnia secondary to his PTSD." He says that a failure to consider these specific bases for Ms. Thompson's opinion is grounds for reversal.

But the ALJ's decision must be read as a whole and with common sense. *Taylor v. Kijakazi*, No. 1:20-cv-01121, 2021 WL 4477865, *8 (N.D. Ohio Sept. 30, 2021). Moreover, "[a]n ALJ need not discuss every piece of evidence in the record for [the ALJ's] decision to stand." *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).

Here, reading the decision as a whole, it is clear that the ALJ carefully reviewed the record, including the notes wherein Ms. Thompson noted anxiety in social situations and insomnia secondary to Mr. Lozancic's PTSD. The ALJ also noted those places in the record where Mr. Lozancic had unremarkable examination findings inconsistent with disabling limitations from his PTSD. Specifically, the ALJ noted the following at various points in the decision:

> The claimant reported that he has difficulty getting along with others . . . . The claimant also testified that he isolates himself and his PTSD is worsening . . . . However, throughout the record, the claimant was routinely cooperative and made average eye contact . . . . He did not exhibit any delusions, obsessions, or compulsions . . . . Despite the relatively stressful nature of the hearing, the claimant did not appear to have significant difficulty interacting with counsel or the undersigned (Hearing Observation). While these examinations, subjective reports, and hearing observations show some degree of impairment, they do not show a marked, serious, or worse degree in this area of mental functioning as a result. Accordingly, the undersigned finds that the claimant has a moderate limitation in this area of functioning. . . .
>
> The claimant reported difficulty completing tasks and concentrating . . . . He also reported that he experiences day terrors and nightmares . . . . On one occasion, the claimant's attention and concentration and ability to

26

abstract were somewhat impaired . . . . However, he otherwise demonstrated an intact ability to abstract . . . . The claimant's attention and concentration were normal . . . .

. . .

The claimant reported that he gets triggered and becomes angry at times . . . . The claimant further reported that he does not handle stress or changes in routine well . . . .

. . .

He reported flashbacks and nightmares . . . . He reported that he has difficulty getting along with others . . . .

. . .

The record supports the claimant received specialized treatment, including psychiatric medication management and therapy related to posttraumatic stress disorder ("PTSD") and major depressive disorder. The claimant reported depression . . . . He further reported anxiety, nightmares, and mood swings . . . . Additionally, the claimant experienced day terrors [and] flashbacks . . . . He indicated that his mood varied . . . . At times, he reported that his symptoms had improved . . . or that his depression had decreased . . . . He also reported decreased nightmares . . . .

. . .

Aside from these findings, the claimant had generally unremarkable mental status examinations . . . . The claimant's mood was euthymic or content, and his affect was full . . . . He had no delusions, obsessions, or compulsions . . . . His thought processes were logical . . . . The claimant's insight and judgment were regularly fair . . . to good . . . . The claimant was well-groomed[,] . . . made average eye contact and was cooperative throughout the record . . . .

. . .

27

> The record reflects routine treatment for the claimant's mental impairments and a history of posttraumatic stress disorder and depression . . . . The claimant's mental status examinations and varied reports throughout the record are not consistent with a degree of disabling mental functional limitation beyond the above residual functional capacity. Aside from some findings as to the claimant's depressed mood . . ., the more complete record contains generally unremarkable mental status examinations . . . .

(Tr. 201–03, 206–08) (internal citations to the record omitted).

The Court finds that the ALJ's discussion of supportability was adequate. Mr. Lozancic points to various parts of the record that he says support Ms. Thompson's opined limitations—*e.g.*, Tr. 496–97, 502–03, 509–10, 514, 543, 549–50, 557, 563, 570, 929, 935, 940–41, 1042—but this is merely a request to reweigh the evidence.

The ALJ's conclusion with respect to the supportability of Ms. Thompson's opinions was supported by substantial evidence, that is "'such relevant evidence as a reasonable mind might accept as adequate to support'" the ALJ's conclusions. *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)).

"The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant'' position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

The Court has thoroughly reviewed Ms. Thompson's checkbox medical source statements and finds that the ALJ did not commit reversible error in finding that opinion not fully persuasive where the opinion lacked a significant explanation, was partially internally inconsistent, and in the face of Ms. Thompson's own mental examination findings and treatment notes throughout the course of treatment revealing overall mild to moderate symptoms that (while ebbing and flowing with life stressors) improved and stabilized over time and with medication.

Accordingly, Mr. Lozancic's assignment of error is overruled.

## VI.     CONCLUSION

Having overruled Mr. Lozancic's assignments of error for the reasons set forth above, the Court AFFIRMS the Commissioner's final decision.

Dated:  <u>March 10, 2026</u>                                    /s *Jennifer Dowdell Armstrong*
                                                                        Jennifer Dowdell Armstrong
                                                                        U.S. Magistrate Judge